IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

| | | |
|---|---|---|
| ANTHONY LAMAR KITCHENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 323-012 |
| | ) | |
| | ) | |
| MS. WELLS, Nurse; | ) | |
| MR. VENTSON, Nurse; and | ) | |
| MS. SCOTT, Nurse, | ) | |
| | ) | |
| Defendants. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, an inmate at Coastal State Prison, is proceeding *pro se* and *in forma pauperis* ("IFP") in this case brought pursuant to 42 U.S.C. § 1983, concerning events alleged to have occurred at Wheeler Correctional Facility ("WCF") in Alamo, Georgia. Because Plaintiff is proceeding IFP, his complaint must be screened to protect potential defendants. Phillips v. Mashburn, 746 F.2d 782, 785 (11th Cir. 1984) (*per curiam*); Al-Amin v. Donald, 165 F. App'x 733, 736 (11th Cir. 2006) (*per curiam*).

## I.    SCREENING THE COMPLAINT

### A.    BACKGROUND

Plaintiff names the following Defendants, all three of whom worked as nurses at WCF during the time period relevant to Plaintiff's allegations:  (1) Ms. Wells; (2) Mr. Ventson; and (3) Ms. Scott.  (See doc. no. 1, pp. 1, 4.)  Taking all of Plaintiff's factual

allegations as true, as the Court must for purposes of the present screening, the facts are as follows.

On February 9, 2022, Plaintiff awoke experiencing nausea and acute abdominal pain. (Id. at 6.)  Defendant Wells saw Plaintiff in the prison infirmary, asked Plaintiff about his pain, checked his vital signs, and told Plaintiff to return to his dormitory.  (Id.)  Plaintiff continued to experience nausea and abdominal pain until April 8, 2022, at which time Plaintiff also experienced constipation and returned to the prison infirmary, where Defendant Wells conducted a visual and physical examination of Plaintiff's stomach.  (Id.)  She was unable to identify the cause of Plaintiff's issues and sent him back to his dormitory.  (Id.)

Plaintiff continued to experience nausea and abdominal pain, as well as vomiting, and on May 4, Plaintiff returned to the infirmary, where he told Defendant Wells he was vomiting a minimum of three times per week and experienced intense abdominal pain.  (Id.)  Defendant Wells prescribed over-the-counter Maalox and sent Plaintiff back to his dormitory.  (Id.)  After continuing to experience these symptoms, Plaintiff returned to the infirmary on June 20, at which time Defendant Wells did not ask any questions or conduct a examination but simply gave Plaintiff a bottle of over-the-counter maximum strength Mylanta.  (Id.)

On July 26, 2022, "after being unable to defecate or experience any type of bowel movement for the previous three months," Plaintiff returned to the infirmary, where Defendant Ventson determined Plaintiff was "100% dehydrated, instructed [Plaintiff] to drink plenty of water, and sent [him] back" to his dormitory.  (Id. at 7.)  A few days later, a WCF unit manager observed Plaintiff vomiting and escorted Plaintiff to the infirmary, where Defendant Ventson did not examine Plaintiff but simply told him to drink more water.  (Id.)

Even though Plaintiff explained he vomited every time he drank water, had lost forty pounds since April, and lost consciousness just prior to his arrival at the infirmary, Defndant Ventson sent Plaintiff back to his dormitory.  (Id.)

Upon returning to the dormitory, Plaintiff lost consciousness and returned to the infirmary.  Two days later, Plaintiff awoke in the "patient bed-section," but no doctor examined or treated Plaintiff.  (Id.)  Instead, the mother of a doctor determined Plaintiff had blood in his vomit, even after Defendant Scott said there was no blood, and ordered WCF to immediately transport Plaintiff to a public hospital.  (Id.)   At the Fairview Park Hospital, doctors performed emergency surgery "to remove and treat portions of [Plaintiff's] deteriorated colon caused by stage 2 colorectal cancer."  (Id.)  Plaintiff seeks two million dollars in compensatory and punitive damages from Defendants because they treated him for "common upset stomach symptoms" when he actually had cancer.  (Id. at 8-9.)

Plaintiff acknowledges there is a grievance procedure at his current place of incarceration, but he states he did not file a grievance about any of the issues raised in the complaint because he "was in and out of consciousness and otherwise incapacitated during the time in which to submit a grievance."  (Id. at 4.)  Plaintiff also asserts he was transferred to a prison "without any jurisdiction" over WCF.  (Id.)

B.    DISCUSSION

1.    Legal Standard for Screening

The complaint or any portion thereof may be dismissed if it is frivolous, malicious, or fails to state a claim upon which relief may be granted, or if it seeks monetary relief from a defendant who is immune to such relief.  See 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b).  A claim is frivolous if it "lacks an arguable basis either in law or in fact."  Neitzke v. Williams, 490

U.S. 319, 325 (1989).  "Failure to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard as dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6)."  Wilkerson v. H & S, Inc., 366 F. App'x 49, 51 (11th Cir. 2010) (citing Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997)).

To avoid dismissal for failure to state a claim upon which relief can be granted, the allegations in the complaint must "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  While Rule 8(a) of the Federal Rules of Civil Procedure does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  Iqbal, 556 U.S. at 678.  A complaint is insufficient if it "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,'" or if it "tenders 'naked assertions' devoid of 'further factual enhancement.'"  Id. (quoting Twombly, 550 U.S. at 555, 557).  In short, the complaint must provide a "'plain statement' possess[ing] enough heft to 'sho[w] that the pleader is entitled to relief.'"  Twombly, 550 U.S. at 557 (quoting Fed. R. Civ. P. 8(a)(2)).

Finally, the Court affords a liberal construction to a *pro se* litigant's pleadings, holding them to a more lenient standard than those drafted by an attorney.  Erickson v. Pardus, 551 U.S. 89, 94 (2007); Haines v. Kerner, 404 U.S. 519, 520 (1972).  However, this liberal construction does not mean that the Court has a duty to re-write the complaint.  See Bilal v. Geo Care, LLC,

981 F.3d 903, 911 (11th Cir. 2020); Snow v. DirecTV, Inc., 450 F.3d 1314, 1320 (11th Cir. 2006).

### 2. Plaintiff Fails to State a Claim Upon Which Relief May Be Granted Because He Did Not Exhaust Administrative Remedies

#### a. The Exhaustion Requirement

Section 1997e(a) of the Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Dismissal for failure to state a claim is appropriate if it is clear from the face of a complaint that the plaintiff failed to exhaust administrative remedies. See Jones v. Bock, 549 U.S. 199, 215 (2007); Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011) (*per curiam*); Solliday v. Federal Officers, 413 F. App'x 206, 208 (11th Cir. 2011) (*per curiam*); Anderson v. Donald, 261 F. App'x 254, 256 (11th Cir. 2008) (*per curiam*). The PLRA's mandatory exhaustion requirement "applies to all prisoners seeking redress for prison circumstances or occurrences." Porter v. Nussle, 534 U.S. 516, 520 (2002). Moreover, the Court does not have discretion to waive the requirement, even if it can be shown that the grievance process is futile or inadequate. See Smith v. Terry, 491 F. App'x 81, 83 (11th Cir. 2012) (*per curiam*); Alexander v. Hawk, 159 F.3d 1321, 1325 (11th Cir. 1998). Rather, "[t]his provision entirely eliminates judicial discretion and instead mandates strict exhaustion, 'irrespective of the forms of relief sought and offered through administrative avenues.'" Johnson v. Meadows, 418 F.3d 1152, 1155 (11th Cir. 2005) (citing Booth v. Churner, 532 U.S. 731, 741 n.6 (2001)).

Furthermore, the PLRA also "requires proper exhaustion." Woodford v. Ngo, 548 U.S. 81, 93 (2006). In order to properly exhaust his claims, a prisoner must "us[e] all steps" in the administrative process; he must also comply with any administrative "deadlines and other critical procedural rules" along the way. Id. at 90 (internal quotation omitted). If a prisoner fails to complete the administrative process or falls short of compliance with procedural rules governing prisoner grievances, he procedurally defaults his claims. Johnson, 418 F.3d at 1159.

Also, because exhaustion of administrative remedies is a "precondition" to filing an action in federal court, the Eleventh Circuit requires prisoners to complete the administrative process *before* initiating suit. Poole v. Rich, 312 F. App'x 165, 166 (11th Cir. 2008) (*per curiam*); see also Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000). Finally, under the PLRA, the Court has no discretion to inquire into whether administrative remedies are "plain, speedy, [or] effective." Porter, 534 U.S. at 524; see also Alexander, 159 F.3d at 1326. Rather, under the PLRA's "strict exhaustion" requirement, administrative remedies are deemed "available" whenever "'there is the possibility of at least some kind of relief.'" Johnson, 418 F.3d at 1155, 1156. "Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." Porter, 534 U.S. at 524.

**b.     Administrative Grievance Procedure**

The administrative grievance procedure is governed by the version of the Georgia Department of Corrections ("DOC") Standard Operating Procedure that resulted in the

promulgation of Policy Number ("PN") 227.02, which became effective May 10, 2019.[1]   The Statewide Grievance Procedure is available to all offenders in the DOC, and if a grievance is filed in reference to a different facility than that of the offender's current place of incarceration, the grievance coordinator at the current facility notifies the grievance coordinator at the originating facility for screening and processing.   PN 227.02 §§ I and IV(E)(5).   "Facilities shall continue to screen and process grievances of Offenders who were subsequently released or transferred from the facility after the grievance was filed."   Id. § IV(E)(8).   Once the warden's response is entered by the originating facility, the prisoner will be notified at the current facility via Kiosk/Tablet, or if not accessible, then notification will be done in writing.   Id. § IV(E)(5).

The grievance procedure has two steps:   (1) Original Grievance, and (2) Central Office Appeal.   Id. § IV(C).   The administrative remedies procedure commences with filing an Original Grievance via the Kiosk/Tablet or with a counselor.   Id. § IV(C)(1)(c) & (d). The inmate has ten calendar days "from the date the offender knew, or should have known, of the facts giving rise to the grievance" to file the grievance.   Id. § IV(C)(1)(b).   The timeliness requirements of the administrative process may be waived upon a showing of good cause.   Id. and § IV(C)(1)(e)(ii)(2).   Good cause is defined as "[a] legitimate reason involving unusual circumstances that prevented the Offender from time filing a grievance." Id. § III(H).   "Examples include:   serious illness, being housed away from a facility covered by this procedure (such as being out on a court production order or for medical treatment)."

---

[1]DOC policies cited herein are publicly available on the DOC web site.   See www.dcor.state.ga.us; *follow* link for Policies & Procedures and then Facilities Division; *click on* link for desired PN (last visited May 5, 2023).

Id.  The grievance coordinator screens the grievance to determine whether to accept it for processing or recommend the Warden reject it.  Id. § IV(C)(1)(e)(i).

The policy requires the Warden provide a response to the prisoner who filed the grievance within forty calendar days from submission of the original grievance; a onetime ten-calendar-day extension may be granted.  Id. § IV(C)(1)(f)(v).  If the grievance is rejected, or if the time allowed for a response to the grievance has expired without action, the offender may proceed to step two of the grievance process, a central office appeal.  Id. § IV(C)(1)(e)(v) & (c)(1)(f)(viii); § IV(C)(2).  The inmate has seven calendar days from the date he receives the Warden's response to the grievance to file a central office appeal, but this time limit may be waived for good cause.  Id. § IV(C)(2)(b).  The Commissioner or his designee then has 120 calendar days after receipt of the grievance appeal to deliver a decision to the prisoner who filed the appeal.  Id. § IV(C)(2)(e).  If the central office appeal results in a determination the original grievance should have been accepted by the facility and processed, the grievance will be returned to the facility for investigation, and the Warden has fifteen calendar days from receipt of the returned grievance to give a decision to the prisoner who filed the grievance.  Id. § (C)(2)(g).  The prisoner has seven calendar days from receipt of the Warden's second response to file a second central office appeal.  Id.

### c.    Plaintiff's Failure to Exhaust

In his complaint, Plaintiff acknowledges there is a grievance procedure at his current place of incarceration and concedes that he did not file a grievance concerning the facts of his complaint.  (Doc. no. 1, pp. 10-11.)  Although Plaintiff's describes allegedly months-long improper medical treatment, he maintains he did not file a grievance because he "was in and out of consciousness and otherwise incapacitated during the time in which to submit a

grievance." (Id. at 4.) This assertion does not excuse the failure to file a grievance because as described above, the grievance procedure provides the time limit for filing a grievance may be waived for good cause, which includes Plaintiff's circumstances of a serious illness and being housed outside of prison for medical treatment. See PN 227.02, §§ III(H) & IV(C)(1)(e)(ii)(2).

Plaintiff's assertion that his transfer away from WCF excuses him from utilizing the grievance procedure likewise fails. As explained above, the Statewide Grievance Procedure is available to all offenders in the DOC, and if a grievance is filed in reference to a different facility than that of the offender's current place of incarceration, the grievance coordinators at the current and originating facilities work in concert to ensure screening and processing occurs. See id. §§ I and IV(E)(5). Moreover, even if Plaintiff had filed a grievance at WCF, upon transferring to a different DOC facility, the Statewide Grievance Procedure provides that facilities shall continue to screen and process grievances filed prior to transfer. See id. § IV(E)(8).

The face of Plaintiff's pleading makes clear he did not complete, indeed he never commenced, the two-step grievance process prior to filing his federal lawsuit. Allowing Plaintiff to decide for himself to bypass the grievance process defeats the rationale behind requiring "proper exhaustion":

> The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction. . . . For example, a prisoner wishing to bypass available administrative remedies could simply file a late grievance without providing any reason for failing to file on time. If the prison then rejects the grievance as untimely, the prisoner could proceed directly to federal court. And acceptance of the late grievance would

> not thwart the prisoner's wish to bypass the administrative process; the prisoner could easily achieve this by violating other procedural rules until the prison administration has no alternative but to dismiss the grievance on procedural grounds.  We are confident that the PLRA did not create such a toothless scheme.

Woodford, 548 U.S. at 95; see also Pavao v. Sims, 679 F. App'x 819, 823 (11th Cir. 2017) (per curiam) ("To satisfy the exhaustion requirement, a prisoner must complete the administrative process in accordance with the applicable grievance procedures set by the prison.").

Similarly here, allowing Plaintiff to proceed in federal court despite his decision to short-circuit the grievance process by not filing any grievance because he was sick and then transferred to a different facility – even though time limits may be waived for serious illness or absence from a facility for medical treatment and grievances may be filed concerning events at a different DOC facility - would defeat the aims of PLRA to review the merits of a prisoner's claim(s), and would not promote "the corrective action that might have obviated the need for litigation, . . . filter  . . . potential frivolous claims, . . .[or] develop[] . . . an administrative record to assist the courts in deciding the controversy." Johnson, 418 F.3d at 1159.  The PLRA requires proper exhaustion of available administrative remedies prior to filing a federal lawsuit, which includes a requirement for compliance with procedural rules governing prisoner grievances.   Id.   Additionally, because proper exhaustion of administrative remedies is a "precondition" to filing an action in federal court, Plaintiff had to complete the entire administrative grievance procedure before initiating this suit. Higginbottom, 223 F.3d at 1261.  It is plain from the face of Plaintiff's complaint, indeed he concedes, that he failed to use the grievance process prior to commencing this case.  Neither his illness nor his transfer excuses his failure to file a grievance.

10

In sum, Plaintiff did not properly exhaust his available administrative remedies, and therefore, the complaint fails to state a claim upon which relief can be granted.  See Solliday, 413 F. App'x at 208 ("A claim that fails to allege the requisite exhaustion of remedies is tantamount to one that fails to state a claim upon which relief may be granted."); Leal v. Ga. Dep't of Corr., 254 F.3d 1276, 1279 (11th Cir. 2001) (per curiam) ("'[U]ntil such administrative remedies as are available are exhausted,' a prisoner is precluded from filing suit in federal court.") (citations omitted).

## II.   CONCLUSION

For the reasons set forth above, Plaintiff's complaint fails to state a claim upon which relief can be granted.  Therefore, the Court **REPORTS** and **RECOMMENDS** Plaintiff's complaint be **DISMISSED** without prejudice for failure to exhaust administrative remedies and this civil action be **CLOSED**.

SO REPORTED and RECOMMENDED this 5th day of May, 2023, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

11